SO ORDERED.

SIGNED December 5, 2016.



_____
JOHN W. KOLWE
UNITED STATES BANKRUPTCY JUDGE
_____

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

IN RE: CHRISTOPHER HEMPHILL                              CASE NO. 16-31212

REASONS FOR DENYING CONFIRMATION AND CONVERTING CASE

Christopher Hemphill seeks confirmation of his Chapter 13 plan. Origin Bank, f/n/a Community Trust Bank ("Origin Bank"), a secured creditor of Hemphill, objected to confirmation alleging that Hemphill is not in good faith in proposing his plan. The Chapter 13 Trustee also objected on the basis that Hemphill has not made any plan payments.

This Court has jurisdiction pursuant to 28 U.S.C. §1334 and by virtue of the reference by the District Court pursuant to Local District Court Rule 83.4.1 incorporated into Local Bankruptcy Rule 9029.3. No party at interest has sought to withdraw the reference and the district court has not done so on its own motion. This hearing on confirmation is designated a core proceeding pursuant to 28 U.S.C. §157(b)(2)(L). The Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Bankr. Pro. 7052. Based on the debtor's testimony, the Court's review of the evidence adduced during the hearing, and the Court's review of all relevant authorities, and for the reasons set forth in this Opinion, confirmation of Hemphill's plan is denied, and this case will be converted to one under Chapter 7 of the Bankruptcy Code.

BACKGROUND

This is Hemphill's second Chapter 13 case in 15 months. His first case was filed on May 28, 2015 (the "2015 case").[1] Origin Bank, one of Hemphill's secured creditors, objected to confirmation in the 2015

---

[1] The entire record from Hemphill's first Chapter 13 case, Case No. 15-30723, was admitted into evidence by reference as Exhibit P-9.

case on the grounds it had not been scheduled or provided for in the proposed plan and that Schedule B did not list the collateral securing its loan, a 2005 John Deere Tractor.[2] The tractor and Origin Bank's debt were later added to Amended Schedules B and D, respectively.[3] Hemphill also amended his plan to provide payment to Origin Bank as a secured creditor, and the plan was confirmed.[4] The Chapter 13 Trustee moved to dismiss the 2015 case when Hemphill failed to make any plan payments which came due after the plan was confirmed; the case was dismissed on December 15, 2015 with a finding under §109(g) of the Code.[5]

Hemphill filed this case on August 15, 2016. While Origin Bank was scheduled as a creditor in this case, it was listed as unsecured rather than secured, and the John Deere Tractor was again omitted from the schedules.[6] Origin Bank objected to confirmation of Hemphill's plan in this case, this time alleging Hemphill is not in good faith in proposing his plan for the following reasons:

- Hemphill testified under oath as part of a state court action that the collateral securing Origin Bank's loan, the John Deere tractor, was stolen, but now claims that he sold the tractor without remitting the proceeds of the sale of the collateral to the bank;[7] and

- Hemphill owns or owned a two bedroom mobile home located at Seven Runs Hunting Club, a Honda four-wheeler, a Pace 24 foot car trailer, two Ford Coupe Legend race cars, and a men's diamond necklace, all of which he failed to disclose in either of his bankruptcy cases as being owned by him or transferred by him prior to filing his bankruptcy cases.[8]

Confirmation of Hemphill's plan and Origin Bank's objection to the plan initially came before the Court for hearing on October 12, 2016, but given the seriousness of the allegations raised in the Origin Bank Objection, the hearing was continued for trial October 26, 2016. Hemphill testified at the October 26, 2016 hearing. At the conclusion of the hearing, Origin Bank moved for conversion of the case to one under Chapter 7, the Chapter 13 Trustee moved to dismiss the case based on the debtor's failure to make any plan payments, and the debtor requested additional time to file an amended plan and make payments pursuant to that plan.

---

[2] Ex. P-9, Doc. No. 14.

[3] Ex. P-9, Doc. No. 20.

[4] Ex. P-9, Doc. No. 25.

[5] Ex. P-9, Doc. Nos. 35, 36. It appears Hemphill made only the first two payments required by his confirmed plan. No payments were made after the plan was confirmed.

[6] Ex. P-10, Doc. No. 1.

[7] Ex. P-10, Doc. No. 19, ¶¶ 4 and 5.

[8] Ex. P-10, Doc. No. 19, ¶¶ 7-11.

2

# LAW AND ANALYSIS

## A. Good Faith

A Chapter 13 plan cannot be confirmed unless the court finds, among other requirements, that "the plan has been proposed in good faith" and that "the action of the debtor in filing the petition was in good faith." 11 U.S.C. §1325(a)(3) and (7). "Good faith" is not defined in the Bankruptcy Code, but jurisprudence provides certain parameters for gauging a debtor's good faith. One such parameter examines a debtor's honesty in preparing his or her schedules and statement of financial affairs. "The integrity of the bankruptcy system depends on full and honest disclosure by debtors of all their assets.'" *In re Coastal Plains, Inc.*, 179 F.3d 197, 208 (5th Cir. 1999)(emphasis omitted), *quoting Rosenshein v. Kleban*, 918 F.Supp 98, 104 (S.D.N.Y. 1996).

A debtor's concealment or misrepresentation of his assets may constitute conduct "sufficient to prevent the debtor from proceeding in Chapter 13." *In re Singh*, 2013 WL 5442763, *1 (Bankr. N.D. Tex. 2013), *citing Marrama v. Citizens Bank*, 549 U.S. 365, 368 (2007). "A debtor has been found to have acted in bad faith when the debtor's 'testimony in the bankruptcy court revealed that his schedules, statement of financial affairs, and statement of current monthly income contained a large number of . . . misrepresentations.'" *In re Singh*, 2013 WL 5442763 *1 (Bankr. N.D.Tex. 2013), *quoting In re Elliot*, 506 Fed. Appx. 291, 294 (5th Cir. 2013). "Individuals engaged in such conduct . . . [do] not belong to the 'class of honest but unfortunate debtors' that the bankruptcy laws were enacted to protect." *In re Jacobsen*, 609 F.3d 647, 656 (5th Cir. 2010), *citing Marrama*, 549 U.S. at 374.

If a plan is not confirmable based on a finding of debtor's bad faith in filing the case or the plan, evidenced by gross misstatements in the schedules and statements, the court may invoke §1307(c) *sua sponte*. *In re Elliott*, 506 Fed. Appx. 291 (5th Cir.2013); *In re Singh*, 2013 WL 5442763, at *2. For purposes of making a bad faith determination, the Court must examine the totality of circumstances. *In re Stanley*, 224 Fed. Appx. 343 (5th Cir. 2007). The United States Fifth Circuit Court of Appeals has identified factors to consider in a determination of whether a case was filed in bad faith, which include:

(1) the reasonableness of the proposed repayment plan;
(2) whether the plan shows an attempt to abuse the spirit of the Bankruptcy Code;
(3) whether the debtor genuinely intends to effectuate the plan;
(4) whether there is any evidence of misrepresentation, unfair manipulation, or other inequities;
(5) whether the filing of the case was part of an underlying scheme of fraud with an intent not to pay;
(6) whether the plan reflects the debtor's ability to pay; and
(7) whether a creditor has objected to the plan.

*Id.* at 346, *citing In re Chaffin*, 816 F.2d 1070 (5th Cir.1987), *mod. In re Chaffin*, 836 F.2d 215 (5th Cir.1988).

Based on the evidence adduced during the confirmation hearing, the Court finds that Hemphill has not been honest, forthcoming, truthful and frank with his creditors or this Court when judged by any

3

standard. The following evidence especially implicates an attempt to abuse the spirit of the Bankruptcy Code through misrepresentation, that the filing of the case was part of an underlying scheme of fraud with an intent not to pay, and a lack of genuine intent to effectuate the plan. *Id.*

   **1. Hemphill provided conflicting testimony regarding the disposition of the Bank's collateral, and he made misrepresentations in his schedules concerning the collateral.**

On December 9, 2013, Hemphill borrowed $15,250 from Origin Bank. To secure the Loan, Hemphill granted Origin Bank a security interest in a John Deere tractor.[9] At the time Hemphill filed his 2015 case, he was still indebted to Origin Bank on this loan, and Origin Bank continued to maintain its security interest in the tractor. Despite these facts, Hemphill inexplicably omitted the tractor and Origin Bank's secured debt from his schedules in the 2015 case. Hemphill amended his schedules to disclose them only after Origin Bank objected to confirmation. In doing so, Hemphill represented to Origin Bank and this Court that he still owned the tractor as of the time he filed the 2015 case.

That representation, however, was not true, because Hemphill later testified that the tractor had been stolen prior to the time he filed his 2015 case. This testimony was given in Origin Bank's collection suit against Hemphill, which was filed in state court after the 2015 case was dismissed. A judgment was rendered in the state court matter on February 25, 2016, and filed in the Mortgage Records of Ouachita Parish on February 26, 2016.[10] In addition to granting a money judgment, the judgment also recognized and enforced Origin Bank's security interest in the tractor. But, Origin Bank was unable to seize the tractor because it could not be located.

On May 24, 2016, Origin Bank deposed Hemphill as part of a Judgment Debtor Examination.[11] There, Hemphill testified *under oath* with regards to the whereabouts of the John Deere tractor. He claimed that he left the tractor at the Silver Creek Hunting Club in Jackson Parish, Louisiana, where it was stolen sometime in 2014 or 2015; he testified that he had neither reported it stolen nor made an insurance claim.[12] Hemphill adamantly denied having sold the tractor during the Judgment Debtor Examination.[13]

Significantly, none of these facts were disclosed in the schedules or Statement of Financial Affairs filed in either his 2015 case or this case. In the 2015 case, Hemphill misrepresented the status of his

---

[9] Origin Bank perfected its security interest in accordance with Louisiana law by filing a UCC-1 which described the collateral as a 2005 John Deere 790 4WD Utility Tractor with Front Loader, bearing Serial Number LV07905894361. The Promissory Note, Commercial Security Agreement and UCC-1 are attached to Proof of Claim No. 2 filed in the 2015 case. Ex. P-9, Claim No. 2; s*ee* Exs. P-1 and P-2 for evidence of perfection.

[10] Ex. P-10, Proof of Claim No. 4.

[11] Ex. P-4.

[12] Ex. P-4, pg. 34, line 5 – pg. 35, line 3.

[13] *Id.*

4

ownership and possession of the John Deere tractor by amending Schedule B to show that he owned the tractor, instead of amending his Statement of Financial Affairs to show that the tractor had been stolen.[14] His schedules and Statement of Financial Affairs in this case make no mention of the tractor whatsoever. And, despite the fact that Origin Bank has a perfected security interest, recognized by a recorded judgment, he scheduled Origin Bank as an unsecured creditor in his current case.

Hemphill was confronted with all of these issues during the hearing on Confirmation. Hemphill's story with regards to the John Deere tractor completely changed at the confirmation hearing. He claims that he lied in his testimony in the Judgment Debtor Examination. He no longer contends the tractor was stolen in 2014 or 2015, but now claims that he sold it in summer 2013 for $8,500 from his used car lot, where it just happened to be parked. Hemphill testified that he had no paperwork evidencing the buyer, the sale price, or the date of sale.

In acknowledging the inconsistencies in his testimony with regard to the tractor between the Judgment Debtor Examination and the hearing on confirmation, the debtor claims the lies were concocted as a result of taking prescription medication after an illness and hospitalization approximately two weeks before the deposition. He also urged that his inability to testify accurately is based on a combination of medical and psychiatric issues, for which he offered no medical evidence or witness.[15]

After evaluating the debtor's demeanor during direct and cross examination, and reviewing the exhibits admitted into evidence, including the entire transcript of the Judgment Debtor Examination, the Court does not find the debtor's explanations for his conflicting testimony credible. Moreover, because Hemphill's explanations are not credible, the Court cannot speculate as to the actual whereabouts of the tractor. This is particularly so where there is not a shred of documentary evidence supporting either an alleged theft or sale of the John Deere tractor.

The evidence is clear that Hemphill, without Origin Bank's knowledge or permission, alienated the Bank's collateral by either sale without remission of proceeds, loss or concealment. Further, Hemphill has actively concealed this asset or its theft/sale from Origin Bank and the Court. He used this Court in furtherance of his affirmative concealment of these facts from Origin Bank when he amended his schedules in his 2015 case to show that he owned the tractor as of that time, instead of showing in his Statement of Financial Affairs that the tractor had been stolen or sold. He also used his amended schedules in the 2015

---

[14] Ex. P-9, Question 8 of the Statement of Financial Affairs filed in the 2015 case required Hemphill to "list all losses from fire, theft, other casualty or gambling within one year immediately preceding the commencement of this case." Hemphill responded: "None."

[15] Hemphill also claimed during the confirmation hearing that Origin Bank was aware that he had sold the collateral. This assertion is belied, however, by Origin Bank's collection action in state court, where it sought recognition of its security interest in the tractor. Moreover, if Origin Bank was aware of the sale of the tractor, there would have been no reason for Hemphill to have claimed the tractor was stolen while testifying under oath during the Judgment Debtor Examination.

case, and the schedules and Statement of Financial Affairs in his 2016 case to perpetuate his scheme of concealment. Simply put, Hemphill's misrepresentations and conflicting testimony with regards to the John Deere tractor is conduct "sufficient to prevent [him] from proceeding in Chapter 13." *In re Singh*, 2013 WL 5442763, *1 (Bankr. N.D. Tex. 2013), *citing Marrama v. Citizens Bank*, 549 U.S. 365, 368 (2007).

**2. Hemphill did not disclose all assets in his Bankruptcy schedules.**

Hemphill's misrepresentations and concealment of assets do not stop with the John Deere tractor. The evidence shows that Hemphill owned community property with his ex-spouse that was not disclosed in either his 2015 case or this case.

In November 2015, approximately one month before his 2015 case was dismissed, Hemphill entered into an agreement entitled "Partition of Community and Settlement of Claims by Christopher Paul Hemphill and Monica Manning Hemphill."[16] This Partition Agreement was incorporated into a Consent Judgment entered in the divorce proceeding between Hemphill and his ex-spouse. Both the Partition Agreement and the Consent Judgment were recorded in the Conveyance records of Ouachita Parish, Louisiana.[17] Hemphill disclosed neither the existence of a spouse or ex-spouse nor that he was a party to a divorce proceeding with Monica Manning Hemphill in Schedule H and his Statement of Financial Affairs filed in the 2015 case.[18] Under the terms of the partition agreement, Hemphill and his former spouse identified the property which they had acquired while married to each other, which included: (1) a mobile home located at Seven Runs Hunting Club, (2) two Honda 500 four-wheelers, (3) a Pace 24ft car trailer, (4) two Ford Coupe Legend race cars, (5) a Honda 2WD four-wheeler, and (6) certain jewelry belonging to Hemphill.[19] Under the terms of the partition agreement, Hemphill received all of these properties with the exception of one of the two Honda 500 four-wheelers (his ex-wife was conveyed the other). A portion of the questioning in both the Judgment Debtor Examination and the confirmation hearing focused on the current whereabouts of the above properties, and why they had not been disclosed by Hemphill in either his 2015 case or this case, as follows:

---

[16] Ex. P-7; Ex. P-4 ("Monica Manning Hemphill versus Christopher Paul Hemphill," Docket No. 15-1075, Fourth Judicial District Court, Ouachita Parish, Louisiana, State of Louisiana).

[17] Ex. P-7, which is the Partition Agreement and Consent Judgment as recorded in the Conveyance Records of Ouachita Parish, Louisiana on January 20, 2016, in COB 2452, Page 637, Entry No. 1694599.

[18] Ex. P-9, Doc. No. 1. In the 2015 case, Schedule H and Question 16 of the Statement of Financial Affairs required Hemphill to disclose, for the eight year period immediately preceding his case filing, his spouse and any and all former spouses. Ex. P-9, Doc. No. 1. Question 4 of the Statement of Financial Affairs in the 2015 case required Hemphill to disclose any and all legal proceedings to which he was a party.

[19] Ex. P-7.

- *The Mobile Home*

The partition agreement shows Hemphill owned a mobile home that he did not schedule in the 2015 case. Initially, Hemphill testified in the Judgment Debtor Examination that he sold the mobile home in summer 2015 for $2,500.[20] Despite being a debtor before this Court at that time, he indicated that he had not informed his bankruptcy attorneys of the sale because he did not know it was required.[21]

In his testimony before this Court, he continued to maintain the mobile home was sold, but his testimony as to the price received, when the sale was made, and by whom, changed. He stated that he only owned a half-ownership interest in the mobile home with the other half being owned by a friend. He claims the mobile home was not sold by him, but by his friend, for $1,500 in September of 2014, for which he received his one-half interest of $750. Regardless of whether sold by him or his friend, Hemphill presented no documentary evidence in the form of a bill of sale, invoice, contract, or any other instrument supporting his assertion that the mobile home had been sold.

In fact, the entirety of Hemphill's testimony regarding the mobile home directly contradicts and is disproved by the partition agreement he freely executed, which clearly shows that Hemphill alone owned the mobile home as of November 2015, a date which is after either of the purported sales of the mobile home testified to by Hemphill in the Judgment Debtor Examination and during the confirmation hearing. At this point, this Court is unable to conclude with any certainty whether Hemphill still owns the mobile home or whether it may have been sold, and if sold, the actual price received, the date of the sale, or the name of the purchaser.

The only thing that can be concluded with any certainty is that, whether still owned or sold, Hemphill was not honest in completing his schedules and Statement of Financial Affairs in either of his bankruptcy cases because there is no mention of the mobile home in either case. If it was still owned, it should have been set forth in Schedule B, and if it was sold, that fact should have been disclosed in the Statement of Financial Affairs.[22]

- *The Race Cars and Trailer*

With respect to the 24-foot Pace car trailer and the two Ford Coupe Legend race cars, Hemphill first testified in his Judgment Debtor Examination that those assets were owned by his 24 year old

---

[20] Ex. P-4, pgs. 35-36.

[21] Ex. P-4, pgs. 35-36.

[22] Question 10(a) of the Statement of Financial Affairs filed in the 2015 case required Hemphill to "list all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within two years immediately preceding the commencement of this case." Hemphill responded "None." See Ex. P-9, Doc. No. 1. Similarly, Question 18 in the Statement of Financial Affairs asked the following of Hemphill: "Within 2 years before you filed for bankruptcy, did you sell, trade, or otherwise transfer any property to anyone, other than property transferred in the ordinary course of your business or financial affairs?" Hemphill only disclosed a sale of a 2008 Honda 300 to David Buck. No other transfers are listed.

7

daughter.[23] He continued to maintain that his daughter owned these assets as of the filing his 2016 case. The Partition Agreement shows otherwise. In an effort to address this inconsistency, he testified in the confirmation hearing that these items were only placed in his name because his daughter did not want her mother to know she owned the race cars. Again, Hemphill has no documentary evidence showing his daughter actually owns these assets, and neither his daughter nor her mother appeared at the hearing to corroborate Hemphill's story. Even if this Court were to believe that he was holding the Pace trailer and race cars for his daughter, then he failed to honestly answer the questions in the Statement of Financial Affairs in both cases, where he stated that he was not holding or controlling property owned by another person.[24]

- ***The Honda Four Wheeler***

The current whereabouts of the Honda 500 four-wheeler that Hemphill received under the Partition Agreement is also not clear. Hemphill testified at the Judgement Debtor Examination that he still owned the Honda 500 four-wheeler, claiming that it "was ready for the graveyard."[25] But this asset was again omitted from his schedules, and if sold, from his Statement of Financial Affairs in this case. The Statement of Financial Affairs in this case does note a sale of a 2008 Honda 300 to David Buck, but that does not appear to be four-wheeler at issue in this case.

- ***The Diamond Necklace***

Origin Bank alleges debtor owns and wears a men's diamond necklace that he failed to schedule as an asset in both cases. In what is a unique instance of consistency, Hemphill's testimony with regard to the diamond necklace matches the testimony he provided in the Judgment Debtor Examination, and is further corroborated by the copy of the Last Will and Testament of the debtor's father, which was admitted into evidence. The Will shows that Hemphill only would have inherited the necklace if his mother pre-deceased his father.[26] Hemphill stated in the confirmation hearing that his mother allows him to wear the necklace intermittently, although it actually belongs to her.

Given Hemphill's declaration in the Partition Agreement, which was incorporated into a Consent Judgment in a Louisiana State Court proceeding, that he owned each of the above described assets, and his testimony in both the Judgment Debtor Examination and this Court that he did not own those assets at the time he executed the Partition Agreement, this Court is unable to conclude with any certainty as to the current status or whereabouts of any of these properties. Given the varying positions taken by Hemphill,

---

[23] Ex. P-4, pg. 37.

[24] Ex. P-9, Case No. 15-30723, Doc.1, Petition, Statement of Financial Affairs Question 14; Case No. 16-31212, Doc. 1 Petition, Statement of Financial Affairs Question 23.

[25] Ex. P-4, pg. 38.

[26] Ex. D-1.

8

and his failure to accurately set forth the disposition of these assets in any of his Bankruptcy schedules, this Court does find, however, that Hemphill has not been honest, forthcoming, truthful and frank in his disclosures in this Court. Hemphill's lack of candor, and his inability to produce any records to support his assertions with respect to the disposition of the above properties provides a sufficient basis for either converting or dismissing his case, depending on the best interests of the estate and the creditors.

**B. Hemphill's failure to make plan payments provides an additional, independent basis to deny confirmation and either convert or dismiss the case.**

The Trustee moved to dismiss Hemphill's case on the grounds he has not made a single plan payment. Hemphill's failure to make payment provides an additional, independent basis for either the conversion or dismissal of his case. A debtor is required to "commence making payments not later than 30 days after" the earlier of "the date of the filing of the plan or the order of relief." 11 U.S.C §1326(a)(1)(a). Additionally, the debtor must show that he will "be able to make all plan payments and be able to comply with the plan." *Hamilton v. Lanning*, 560 U.S. 505, 521, 130 S.Ct. 2464 (2010)(plan cannot be confirmed "unless the debtor will be able to make all payments under the plan and comply with the plan"). A debtor's "failure to commence making timely payments under §1326," provides "cause" for a bankruptcy court to either "convert [the] case . . . to a case under chapter 7", or "dismiss [the] case . . ., whichever is in the best interests of the creditors and the estate." 11 U.S.C. §1307(c)(4).

In this case, Hemphill's plan required him to make 60 monthly payments of $2,900, with the first payment being due on September 15, 2016 (i.e., 30 days after the order of relief was issued and the plan was filed). All subsequent payments were due on the 15th of each month. Thus, as of the date of the confirmation hearing, both the September and October payments had become due. It is undisputed that Hemphill failed to make either payment. As a result, his plan cannot be confirmed, and cause exists to either convert of dismiss his case under §1307(c)(4).

**C. Dismissal or conversion is determined by the best interest of the creditors and estate.**

Since Hemphill's plan is not confirmable, §1307(c) permits the court to dismiss or convert a case to one under Chapter 7, "whichever is in the best interests of creditors and the estate." 11 U.S.C. §1307(c). The evidence reveals numerous inconsistencies in Hemphill's testimony and in his disclosure with regard to non-scheduled assets he may or may not own. Given these inconsistencies, it would seem that conversion of this case would serve the best interests of the estate and the creditors because all of Hemphill's financial affairs could then be subjected to an independent investigation. Indeed, Hemphill's actions in this Court "cry out for an independent trustee to investigate the debtor's financial affairs, marshal his assets, bring appropriate actions to recover property, and if necessary, object to the debtor's discharge." *In re Eatman*, 182 B.R. 386, 394 (Bankr. S.D.N.Y. 1995).

9

Further, the debtor's scheduled assets reveal real property with equity. Given the fact that there are both scheduled and unscheduled assets of the estate to be investigated and liquidated by a Chapter 7 Trustee, it is certainly not in the best interest of the creditors to dismiss the case, which would permit the debtor to further conceal or alienate assets. Notwithstanding the Court's findings, it is not unsympathetic to the debtor's argument that this case was filed in attempt to save his home, and notes that given the pending foreclosure, dismissal of the case is also not in the debtor's best interest. He may file amended schedules and a §521 Statement of Intention in order to pursue an honest and orderly liquidation under the supervision of a Chapter 7 Trustee and court. Under the assignment of cases in this division, a different judge will preside over the converted case, and as in the *Elliot* case, where the debtor was permitted to receive a discharge in the converted Chapter 7 case, this debtor may benefit from the opportunity to conduct his affairs differently in the converted case.[27]

## CONCLUSION

For the foregoing reasons, Confirmation of the Chapter 13 Plan will be denied, debtor's request for time to file an Amended Plan will be denied, and the case will be converted to one under Chapter 7. A separate and conforming Order will be concurrently issued.

# # #

---

[27] See *Hobbs v. Elliot*, Adv. No. 13-3001 (W.D.La. 2013).